UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

D / F

-------------------------------------------------------------------X

JASMINE A. JACKSON,

                Plaintiff,

      -against-

CAROLYN W. COLVIN,
Commissioner of Social Security,

                Defendant.

**MEMORANDUM & ORDER**

**12-CV-5128 (NGG)**

-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

    Plaintiff Jasmine A. Jackson brings this action, pursuant to 42 U.S.C. §§ 405(g)

and 1383(c), seeking judicial review of the Social Security Administration's ("SSA")

determination that she is not disabled and therefore not entitled to Disability Insurance Benefits

("DIB") or Supplemental Security Income ("SSI"). Jackson argues that an administrative law

judge ("ALJ") committed legal error in denying her application for benefits by failing to re-

contact Plaintiff's treating physician to obtain further information regarding the physician's

diagnoses. Both Plaintiff and Defendant, Carolyn W. Colvin, the Acting Commissioner of

Social Security,[1] have filed motions for judgment on the pleadings pursuant to Federal Rule of

Civil Procedure 12(c). (See Def.'s Not. of Mot. (Dkt. 15); Pl.'s Not. of Mot. (Dkt. 17).) For the

reasons set forth below, the Commissioner's motion is DENIED, Plaintiff's motion is

GRANTED, and this case is REMANDED to the SSA for further administrative proceedings.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is respectfully directed to amend the caption
to reflect that Carolyn W. Colvin is the Acting Commissioner of Social Security.

## I.    BACKGROUND

Plaintiff was born on April 15, 1986. (See Administrative R. ("R.") (Dkt. 21) at 36.) Plaintiff has some high school and college experience, but is not a high school graduate.[2] (Id. at 38.) Plaintiff previously worked as a self-employed hairdresser and babysitter for approximately 6 hours per day from 2006 through part of 2007. (Id. at 39-40.) In addition, in connection with receiving public assistance, Plaintiff worked as a seasonal maintenance worker for the New York City Parks Department for 4 months in 2007. (Id. at 40.) For 1 month in 2007, Plaintiff also did clerical work through the Work Experience Program with the New York City Human Resources Administration ("HRA"). (Id. at 51.) However, in DIB and SSI disability applications dated November 13, 2008, Plaintiff stated that she "became unable to work because of a disabling condition [that arose] on August 15, 2007." (See id. at 102, 108.)

### A.    Medical Evidence[3]

1. Addabbo Family Health Center ("AFHC"): Dr. Jeongwon Kim; Dr. Thomas Pattuglen, Jr.; Dr. Cho Cho Han

Plaintiff was treated at AFHC by numerous doctors from September 2007 through December 2008. (Id. at 178-80, 194-232.) On September 10, 2007, Plaintiff complained of severe headaches. (Id. at 194.) Dr. Kim proscribed Naproxen to Plaintiff after an examination produced no abnormalities. (Id. at 200.)

On November 5, 2007, Plaintiff complained of back pain and nausea. (Id. at 202.) After Dr. Kim noted Plaintiff was walking without difficulty, Dr. Kim diagnosed back pain, but did not

---

[2] Plaintiff entered a joint-degree program through which she could have earned a General Educational Diploma and an associate's degree within a 16-month period, but failed to complete the program because of her back pain. (Id. at 38.)

[3] Plaintiff "respectfully defers to and endorses the thorough and frankly objective discussion of each medical exhibit referenced in Defendant's Memorandum of Law." (See Pl.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings ("Pl.'s Mem.") (Dkt. 18) at 3 (citing Def.'s Mem of Law in Supp. of Mot. for J. on the Pleadings ("Def.'s Mem.") (Dkt. 16) at 5-11).)

order x-rays or prescribe medication because Plaintiff might have been pregnant. (Id.) On November 9, 2007, however, Dr. Pattuglen ordered lumbosacral x-rays and prescribed Flexeril and Robaxin. (Id. at 204; see also Def.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings ("Def.'s Mem.") (Dkt. 16) at 5.) X-rays of Plaintiff's lumbar spine were ultimately negative. (R. at 187.)

On December 12, 2007, Dr. Kim noted that although Plaintiff claimed to have lower back pain, x-rays were negative, and clinically, no deficits were present. (Id. at 210.) On December 24, 2007, Dr. Han referred Plaintiff for magnetic resonance imaging ("MRI") of her lumbar spine. (Id. at 177, repeated at 186.) The MRI showed central and right-sided L4-L5 disc herniation, annulus bulge at L5-S1, and disc degeneration at both levels. (Id. at 177, 186.)

### 2. Peninsula Hospital Center ("Peninsula")

Upon referral from AFCH, Plaintiff was seen at Peninsula's Orthopedics Department on March 20, 2008. (See id. at 185.) Plaintiff reported a history of back pain for the last 4 to 5 months and commented that the pain radiated down her left leg to her toes. (Id. at 184.) Examination did not show any focal tenderness at the spinous process. (Id.) Straight leg raising was negative, bilaterally. (Id.) There was pain, however, to light touch in the lumbar region. (Id.) The orthopedist prescribed Tylenol #3 and told Plaintiff to return in 2 weeks. (Id.)

During her follow-up appointment at Peninsula on April 10, 2008, Plaintiff said that she had been unable to fill the prescription. (Id. at 183.) On examination, there was tenderness to palpation over L4-L5. (Id.) Plaintiff complained of "radicular symptoms" on extension and rotation. (Id.) Reflexes and sensation were intact, and motor strength was full (5/5). (Id.) The orthopedist diagnosed disc herniation at L4-L5 and L5-S1, ordered x-rays, and prescribed Mobic,

Robaxin, and Medrol dose pack. (Id.)[4]

Lumbosacral x-rays performed on May 1, 2008, showed straightening of the lumbar curvature. (Id. at 182.) Plaintiff was seen by the orthopedist at Peninsula the same day. (Id. at 261.) She reported no improvement, with medication only providing temporary relief. (Id.) On examination, Plaintiff exhibited tenderness to palpation at L4-L5 as well as radicular symptoms, but reflexes and sensations were intact, and there was again full motor strength (5/5). (Id.) Back flexion was to greater than 70 degrees, and extension was to 45 degrees with pain. (Id.) The orthopedist prescribed physical therapy and Tylenol with codeine, and advised Plaintiff to consider epidural injections. (Id.)

### 3. AFHC: Dr. Hana Ilan; Dr. Charlie Chen

AFCH treatment records dated May 6, 2008, indicate that Plaintiff's symptoms were improving and that her back pain was controlled with Skelaxin. (Id. at 217.) Dr. Ilan, a physiatrist with AFHC, saw Plaintiff on July 16, 2008, and prescribed physical therapy 3 times per week for 4 weeks to treat back pain caused by the herniated disc at L5-S1. (See id. at 178, 271.) On July 31, 2008, Dr. Chen noted that Plaintiff had back pain caused by a herniated disc at L4-L5, and that he advised Plaintiff to avoid heavy lifting and prolonged walking and sitting. (Id. at 179, repeated at 262.)

### 4. Arbor WeCare: Dr. Fatima Zumairi

On September 19, 2009, Plaintiff underwent an evaluation by Dr. Zumairi at Arbor WeCare. (Id. at 234-59.) Plaintiff stated that she was taking pain medication and attending physical therapy 3 times per week. (Id. at 241-42.) The examination revealed normal findings except for pain to straight leg raising on the left side. (Id. at 245-46.) A form indicated that Plaintiff's abilities to climb and descend stairs, bend at the hip and knee, turn head, bend neck,

---

[4] On April 29, 2008, Dr. Chen, with AFCH, also prescribed Skelaxin. (See id. at 215.)

and write and grasp, were normal. (Id. at 251.) Plaintiff's strengths included her leisure skills, her compliance with treatment and medications, her abilities to travel independently, and her ability to maintain adequate grooming, hygiene, and housing. (Id. at 241.) Plaintiff's barriers to employment included her inability to do heavy lifting or to sit and stand for extended periods of time. (Id.)

According to an unsigned opinion from Arbor WeCare dated September 23, 2008, Plaintiff could sit, stand, walk, climb, and kneel for 1 to 3 hours (each activity) consistently. (Id. at 254-55.) Plaintiff could also grasp and reach for 6 to 8 hours consistently. (Id.) Plaintiff could not lift items weighing more than 10 pounds. (Id. at 255.) Therapy and pain management were recommended. (Id.) Plaintiff was also advised to avoid bending or twisting, but could alternate between these activities. (Id.) Plaintiff was further advised to participate in 35 hours of vocational rehabilitation. (Id. at 248.) A physiatrist also recommended vocational rehabilitation. (Id. at 250.)

     5.     AFHC: Dr. Ilan; Dr. Chen

On October 1, 2008, Dr. Chen wrote that Plaintiff was unable to work "at this time" because she was receiving physical therapy 3 times per week and needed pain management follow-up. (Id. at 180.)

On November 12, 2008, Dr. Ilan completed a form in which he indicated that Plaintiff was "temporarily unemployable," and that if Plaintiff did not respond to physical therapy, she should undergo 4 to 6 weeks of pain management. (Id. at 265 (emphasis added).) On December 8, 2008, Dr. Chen completed a similar form, but indicated that Plaintiff was unable to work for at least 12 months. (Id. at 269.)

5

6. <u>Industrial Medical Associates: Dr. Justin Fernando</u>

Dr. Fernando consultatively examined Plaintiff on December 18, 2008. (<u>Id.</u> at 188-91.) Plaintiff related to Dr. Fernando that she first experienced back pain when she was pregnant with her child, who was now 2 years old; and that she recently experienced severe lower back pain requiring medical attention. (<u>Id.</u> at 188.) She had received physical therapy and had been administered at least 1 cortisone shot. (<u>Id.</u>) She further explained that she performed daily personal hygiene (<u>id.</u> at 189), but that sitting and standing for long periods, and doing household chores that required requiring bending, lifting, and carrying, "all take a toll" (<u>id</u>). She was presently taking Hydrocodone/APAP. (<u>Id.</u>)

On examination, Plaintiff's gait and station were normal, she could walk on heels and toes, squat fully, and she needed no help getting on and off of the examining table or rising from a chair. (<u>Id.</u>) Hand and finger dexterity was intact; grip strength was 5/5 bilaterally. (<u>Id.</u>) There was full range of motion in the cervical spine, shoulders, elbows, forearms, wrist, and fingers. (<u>Id.</u>) There was no joint inflammation, effusion, or instability. (<u>Id.</u>) There was full range of motion in the thoracic and lumber spines. (<u>Id.</u> at 190.) With respect to lower extremities, range of motion was full, strength was 5/5, and straight leg raising was negative. Reflexes were present and equal. (<u>Id.</u>) Reflexes were diminished, however, at the patella tendons as compared to the ankle reflexes. (<u>Id.</u>) But there was no joint effusion, inflammation, or instability. (<u>Id.</u>)

Dr. Fernando diagnosed Plaintiff with chronic lower back pain with bilateral subjective radiculopathy. (<u>Id.</u>) He commented that Plaintiff had difficulty in the upright position and that Plaintiff's pain was aggravated by "nearly everything she does" in the upright position. (<u>Id.</u>) He also noted that Plaintiff had discogenic disease with possible disk herniation and nerve root compression at L4-L5, but it was unlikely that she had disc herniation or nerve root compression at L5-S1, since ankle reflexes, when tested, were brisk. (<u>Id.</u>)

6

### 7. Beth Israel Medical Center: Dr. Stephen Scelsa

On March 11, 2009, Plaintiff underwent a neurological examination by Dr. Scelsa, who conducted electrodiagnostic studies at the Beth Israel Medical Center Neurology Department. (Id. at 282-85, 287-89.) Plaintiff related that she had sciatica in her left leg since giving birth in 2006, and that in August 2007, after lifting heavy garbage pails, she experienced lower back pain. (Id. at 282.) She had also developed left-sided neck pain 4 months earlier. (Id.)

Upon examination, Plaintiff's straight leg raising was negative bilaterally, and gait was normal, including heel and toe walking. (Id. at 283.) In addition, finger-to-nose and tandem gait was steady, muscle strength was full, and there was no muscle atrophy. (Id.) There was slight loss of sensation to pinprick in the legs, which appeared to be diminished in left L5-S1 dermatomes. (Id.) Reflexes were 2+ except for 1+ triceps jerk symmetrically. (Id. at 284.) Nerve conduction study, F-wave, H-reflex, and electromyogram (EMG) findings were normal, except for a finding of prolonged left tibial F-wave minimal latency. (Id.) According to Dr. Scelsa, this was a nonspecific finding not clearly differentiating mild left tibial nerve from left S1 radicular dysfunction. (Id.) There was no definitive electrophysiological evidence of left lumbosacral radiculopathy, left sciatic neuropathy, or polyneuropathy. (Id.) Dr. Scelsa's clinical impression was left S1 radicular pain without objective signs. (Id.) Dr. Scelsa suggested an MRI of Plaintiff's cervical spine to screen for demyelinating lesions or disc herniation. (Id.)

### 8. Phillips Ambulatory Care Center: Dr. David Woog

On March 19, 2009, Dr. Woog performed an MRI of the lumbosacral spine. (Id. at 286.) The MRI indicated posterolateral herniated disc at L4-L5 on the right, and minimal posterior bulging of the disc at the L5-S1 level, with slight compression of the thecal sac and right L5 nerve root. (Id.) On March 25, 2009, Dr. Woog administered Plaintiff a left L5 epidural steroid injection of 2% Lidocaine. (See id. at 297.)

7

9.     Other Medical Evidence

On July 29, 2009, Plaintiff underwent a somatosensory evoked potentials ("SSEP") study to determine the presence of a demyelinating disease; the results were normal. (Id. at 309-10.) A referral form dated May 3, 2010, from the New York Children's Health Project at Montefiore Medical Center indicated that Plaintiff was pregnant and needed to start prenatal care. (Id. at 291.)

**B.     Other Evidence**

1.     Plaintiff's Testimony

In an unsigned and undated Disability Report completed after she applied for DIB and SSI in November 2008, Plaintiff stated that her ability to work was limited because she could not engage in prolonged sitting, standing, walking, or heavy lifting. (Id. at 130.) She stopped working on August 15, 2007, when the pain became unbearable. (Id.) In a Function Report dated December 16, 2008, Plaintiff related that she lived with her spouse and 2-year-old in an apartment. (Id. at 137-38, 144.) During the day, Plaintiff made meals, went to physical therapy, and gave her spouse his daily insulin shots. (Id. at 138.)

Plaintiff stated, however, that she could not sit on the train for more than 15 minutes or walk more than 25 minutes, and that her legs and left arm started to tingle and go numb while sleeping. (Id.) It was difficult for her to use the toilet. (Id. at 139.) Plaintiff also stated that she had to be told to eat because of her depression, and she could only fix quick, fast, and easy microwavable meals. (Id.) Plaintiff stated that she was unable to do household chores. (Id. at 140.) Still, she went outside 2 to 3 times per week, and walked, rode in a car, or used public transportation independently. (Id.) Plaintiff shopped for groceries when necessary. (Id. at 141.) She stated that she did not get along with her family and did not have friends. (Id. at 142.)

In a pain questionnaire dated December 16, 2008, Plaintiff stated that she had sciatica

8

when she was pregnant in 2008, and that her pain had worsened. (Id. at 161, 163.) She reported that she saw Dr. Charlie Chen for her pain, had seen an orthopedist, and "had been to pain management." (Id.) The medication she took for her pain caused her to feel drowsy. (Id. at 162.)

Following an initial denial of DIB and SSI benefits on March 3, 2009 (see id. at 10), Plaintiff requested and received an administrative hearing before an ALJ on July 7, 2010 (id.). At the hearing, Plaintiff testified that she could not work because she was 3 months pregnant, and could not sit or stand for long periods of time, and had pain and numbness in her legs and arms. (Id. at 40-42.) She had experienced these same symptoms prior to her pregnancy, but her symptoms were worsening and starting to affect her right side in addition to her left side. (Id.) She also experienced back pain from her upper neck down to her toes; this began when she was previously pregnant in 2006. (Id. at 41.)

Plaintiff had recently started treatment at Mt. Sinai Hospital. (Id. at 42-43.) Plaintiff had previously seen a physician at Beth Israel Hospital in February 2010, but switched providers to Mt. Sinai when her Beth Israel physician wanted to prescribe methadone. (Id. at 43-44.) Prior to Beth Israel, Plaintiff testified that she received physical therapy and treatment at AFHC. (See id. at 44.) Plaintiff underwent surgery for hemorrhoids in November 2009, and testified that she no longer had any hemorrhoid problems. (Id. at 44-45.) In addition to medication for her back pain, Plaintiff had received trigger-point injections and physical therapy, which included traction. (Id. at 45.) She was not taking medication at the time of the hearing due to her pregnancy. (Id. at 49.) Plaintiff testified that when she took medications such as Oxycodone and muscle relaxers, she became dizzy and nauseous. (Id. at 50.)

Plaintiff further testified that she thought she could walk about half an hour without too

9

much pain. (Id. at 46.) She could walk for approximately 15 minutes, stand about 5 to 10 minutes, and sit for half an hour with no pain. (Id.) Plaintiff also testified that she could lift and carry a gallon of milk or a 2-liter soda bottle. (Id. at 47.) Plaintiff could not squat or bend forward or backward because her knees were "starting to go bad." (Id.) She did not have any problems using her hands or arms because she was right handed. (Id.) Plaintiff could cook, but did most of her cooking sitting down. (Id. at 48.) When grocery shopping, she walked around the store and selected items but could not put items in the cart if they were too heavy. (Id.) Plaintiff experienced difficulty caring for her son in that she could not carry him, bathe him, or play with him. (Id.) During the day, Plaintiff rested, attended appointments at the HRA, and watched television. (Id. at 49.) Plaintiff testified that she attempted a clerical work assignment through HRA in 2007, but she only lasted 1 month because of her back pain. (Id. at 51.)

## 2. Medical Expert Evidence: Dr. John Axline

Dr. Axline, an orthopedic surgeon, reviewed Plaintiff's entire medical file on October 26, 2010, and provided answers to interrogatories submitted by the ALJ. (See id. at 327-36.) Dr. Axline indicated that Plaintiff's impairment was degenerative disc disease, lumbar, at levels L4-L5 and L5-S1, which did not meet the criteria of Listing 1.04(A) in the SSA's Listing of Impairments in 20 C.F.R. pt. 404: straight leg raising was normal; there was no evidence of motor or reflex loss; and only minor sensory impairment on the left lower extremity, which did not match imaging abnormalities. (Id. at 334-35.) With respect to the criteria of Listing 1.00(B)(2)(b), Dr. Axline noted that Plaintiff ambulated effectively. (Id. at 335.)

Dr. Axline assessed that in view of her back impairment and intermittent symptoms, Plaintiff was limited to lifting or carrying 20 pounds occasionally, and 10 pounds frequently. (Id. at 328, 336.) Plaintiff could continuously sit for 2 hours, stand for 1 hour, and walk for 1 hour. (Id. at 329.) In an 8 hour workday, Plaintiff could sit for 6 hours, stand for 2 hours, and

walk for 4 hours. (Id.) She had no restrictions in using her hands for reaching, handling, fingering, feeling, or pushing or pulling. (Id. at 330.) With respect to operating foot controls, Plaintiff could use her right foot "continuously," and her left foot "frequently." (Id.) Plaintiff could "occasionally" climb ladders or scaffolds, kneel, crouch, or crawl; "frequently" stoop and climb stairs and ramps; and "continuously balance." (Id. at 331.)

Finally, Plaintiff could "frequently" work in areas with unprotected heights, moving mechanical parts, and loud noises. (Id. at 332.) Plaintiff could also "frequently" operate a motor vehicle and work in environments that were extremely hot or cold, and contained dust, odors, fumes, and pulmonary irritants. (Id.) She could "continuously" work in environments with vibrations, humidity, and wetness. (Id.) According to Dr. Axline, no other functional restrictions were supported by the medical records. (Id. at 336.)

### 3. Vocational Expert Evidence: Amy Leopold

On November 17, 2010, Amy Leopold, a vocational expert, provided responses to the ALJ's written interrogatories. (See id. at 171-74.) Leopold indicated that Plaintiff's past work as a hairdresser was light-skilled work, and her job as a parks groundskeeper was medium and unskilled. (Id. at 171.) Leopold was also asked to assume a hypothetical individual born on the same date as Plaintiff, with a limited education, who was able to communicate in English, who had the same work experience as Plaintiff, and who could: lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for 6 hours out of 8, up to 2 hours at a time without interruption; walk for 4 hours out of 8, up to 1 hour at a time without interruption. (Id.) The individual could operate foot controls with the left foot, frequently; climb ladders, ropes, or scaffolds, kneel, crouch and crawl, occasionally; climb stairs/ramps and stoop, frequently; and, be exposed to work around unprotected heights, moving mechanical parts, dust, odors, fumes and pulmonary irritants, extreme heat and extreme cold, as well as operate a motor vehicle,

11

frequently. (Id.) The individual could tolerate up to a loud (heavy traffic) noise level. (Id. at 172.) Leopold indicated this hypothetical individual could not perform Plaintiff's past work because standing and walking for 6 hours were required elements of a hairdresser position, and a groundskeeper was required to lift and carry up to 50 pounds. (Id.)

When asked whether there were any unskilled occupations that such an individual could perform, Leopold identified the work of a cashier (170,000 jobs available locally, 3 million available nationally); assembler (50,000 jobs available locally, 1.6 million available nationally); ticket seller (170,000 jobs available locally, 3 million available nationally); and table worker (3,400 jobs available locally, 472,000 available nationally). (Id. at 173.)

## II.    PROCEDURAL HISTORY

Proceeding pro se, Plaintiff filed applications for DIB and SSI on November 13, 2008, alleging disability as of August 15, 2007, due to a herniated disc in her lower back. (See id. at 130.) After Plaintiff's applications were denied (id. at 60-65), Plaintiff requested a hearing before an ALJ (id. at 73-74). The ALJ conducted a hearing on July 7, 2010, in Queens, New York. (Id. at 27-55.) On January 11, 2011, the ALJ issued a decision denying Plaintiff's claims for DIB and SSI. (See id. at 7-22.) He found that Plaintiff was not disabled under the Social Security Act (the "Act") because she could perform a range of light work existing in substantial numbers in the regional and national economies. (Id. at 20-21.) Plaintiff filed no objections, and on August 14, 2012, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. (See id. at 1-4.)

Plaintiff, now represented by counsel, filed the instant action on October 12, 2012, seeking judicial review of the SSA's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (See Compl. (Dkt. 1) ¶¶ 1-2.) The Commissioner filed her Answer, and mailed a copy of the administrative record to Plaintiff, on February 25, 2013. (See Answer (Dkt. 10); Not. of Mailing

(Dkt. 10-1).) The Commissioner and Plaintiff subsequently filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def.'s Mem.; Pl.'s Mem. of Law in Supp. of Cross Mot. for J. on the Pleadings ("Pl.'s Mem.") (Dkt. 18).) The Commissioner and Plaintiff then filed reply briefs in support of their respective cross-motions for judgment on the pleadings. (See Def.'s Reply Mem. of Law in Further Supp. of Her Mot. for J. on the Pleadings, and in Opp'n to Pl.'s Cross-Mot. for J. on the Pleadings ("Def.'s Reply") (Dkt. 19); Reply Mem. of Law in Further Supp. of Pl. Jasmine Jackson's Cross Mot. for J. on the Pleadings ("Pl.'s Reply") (Dkt. 20).)

## III.    LEGAL STANDARD

### A.    Review of Final Determinations of the Social Security Administration

Under Rule 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)). Thus, as long as

(1) the ALJ has applied the correct legal standard, and (2) his findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at *9.

## B.    Determination of Disability

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Act. See 20 C.F.R. § 404.1520(a)(4). In Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.
>
> If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" . . . of the social security regulations. These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.

14

> If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

> If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

Id. at 1022 (internal citations omitted) (quoting Decker v. Harris, 647 F.2d 291, 298 (2d Cir. 1981)).

The "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 75, 80 (2d Cir. 1995) (quoting Caroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). But if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a limited shift in the burden of proof at step five that requires the Commissioner to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's education background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll, 705 F.2d at 642). Moreover, "the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id. at *10 (citing 20 C.F.R. § 404.900(b)).

## IV.  DISCUSSION

### A.  The ALJ's Decision

Plaintiff does not dispute the first three steps of the ALJ's five-step analysis: (1) that Plaintiff has not engaged in substantial gainful activity since August 15, 2007; (2) that Plaintiff suffers from degenerative disc disease of the lumber spine; and (3) that Plaintiff does not suffer from an impairment that meets the Listing of Impairments.  (See R. at 12.)  At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") "to perform a range of light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), because she was able to:

> [L]ift and carry up to 20 pounds occasionally and up to 10 pounds frequently, sit for 2 hours at a time and for 6 hours in an 8-hour work day, stand for one hour at a time and for 2 hours in an 8-hour workday, and walk for one hour at a time and for 4 hours in an 8-hour workday.  She is able to continuously use her hands for reaching, handling, fingering, feeling, and pushing/pulling; and to use her right foot continuously for foot controls, and her left foot frequently.  Further, [she] is able to balance continuously, to climb stairs and ramps and to stoop frequently, and to climb ladders or scaffolds, kneel, crouch, and crawl occasionally.  She has no restrictions in exposure to humidity and wetness or vibrations, and can tolerate frequent exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, dust/odors/fumes/pulmonary irritants, and extreme cold or heat. She can tolerate noise up to a loud (heavy traffic) level.

(R. at 13.)  Based on Plaintiff's RFC, the ALJ found at step four that Plaintiff was "unable to perform any past relevant work" but, at step five, that she was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (Id. at 20, 21.)  Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (Id. at 21.)

In conducting his assessment of Plaintiff's condition, the ALJ gave "limited weight" to the opinions of Dr. Chen, a treating physician who opined, among other things, that Plaintiff was unable to work for at least 12 months.  (Id. at 14-15, 19.)  The ALJ reasoned that Dr. Chen

specialized in family medicine—not orthopedics—and that he provided "no explanation or elaboration" for his conclusions. (Id. at 15, 19.) The ALJ also noted that Dr. Chen "fail[ed] to identify exertional or non exertional limitations that would result in the inability to perform basic work activities on a sustained basis." (Id. at 14.)

## B.    ALJ's Duty to Develop the Record

Plaintiff argues that the ALJ erred in reaching his conclusion that Plaintiff was not disabled because the ALJ failed to re-contact Plaintiff's treating physician[5] to obtain further information regarding the treating physician's diagnoses. (See Pl.'s Mem. at 10-13.) In response, Defendant points out that Plaintiff "failed to identify any significant gaps in her medical [record] that would warrant remand." (Def.'s Reply at 2.) Moreover, Defendant argues that the ALJ was not required to recontact Dr. Chen for clarification because his opinions were not entitled to any special weight under the treating physician rule. (Id. at 3-4.)

"As a general rule, a treating source's opinion on the nature and severity of an individual's impairment is given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." Geronimo v. Colvin, No. 13-CV-8263 (ALC), 2015 WL 736150, at *5 (S.D.N.Y. Feb. 20, 2015) (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996)); see also Cleveland v. Apfel, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000) ("The Social Security regulations give special evidentiary weight to the opinion of a treating physician

[5] A "treating physician" is a physician "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008) (adopted report and recommendation). "Generally, [the SSA] gives more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527.

when diagnosing the nature and severity of a plaintiff's condition." (citing Clark, 143 F.3d at 118)).

Thus, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Id. (quoting Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (Sotomayor, J.)).[6] Unlike a judge in a trial, an ALJ must on behalf of all claimants "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)). While this is true regardless of whether a claimant is represented by counsel, see Rosa, 168 F.3d at 79, the ALJ's duty is heightened when a claimant proceeds pro se, see Moran, 569 F.3d at 113. See also Lamay, 562 F.3d at 509 ("[W]here a claimant proceeds pro se, the ALJ has a duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" (quoting Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980))).

Accordingly, an ALJ "must seek additional evidence or clarification when the 'report from the claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Calzada v. Asture, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting 20 C.F.R. §§ 404.1512(e)(1)). "Thus, if a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion." Id.

---

[6] Notwithstanding an ALJ's general duty, "the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order) (citing Rosa, 168 F.3d at 79 & n.5 )). Where there are no obvious gaps in the administrative record, and where an ALJ "already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) (quoting Rosa, 168 F.3d at 79 n.5).

at 269-70 (citing Rosa, 168 F.3d at 79); see also Peterson v. Barnhart, 219 F.

Supp. 2d 491, 494-95 (S.D.N.Y. 2002) (noting "sparse notes, incomplete record[s] of medical

visits, and brief, conclusory assessments" constitute gaps in the record (citing Rosa, 168 F.3d

at 79)). "The rationale behind this rule is that a 'treating physician's failure to include this type

of support for the findings in his report does not mean that such support does not exist; he might

not have provided this information in the report because he did not know that the ALJ would

consider it critical to the disposition of the case.'" Geronimo, 2015 WL 736150, at *5 (quoting

Rosa, 168 F.3d at 80).

The Second Circuit's application of this rule in Rosa is instructive. There, the treating

physician submitted "only a one-page, 'wholly conclusory' assessment finding the claimant was

incapable of doing any work requiring even minimal lifting or carry[ing] or sitting or standing

for more than one to two hours during the course of an eight-hour work day." Id. at *6 (quoting

Rosa, 168 F.3d at 75, 80). After the ALJ rejected this assessment, emphasizing that the treating

physician's report failed to corroborate this finding, the Second Circuit vacated the ALJ's

decision, noting that the ALJ "erred in placing such significance to this omission without taking

steps to have the physician supplement his findings with additional information, especially given

that the claimant's testimony suggested that there might be additional medical records which

were not in the record." Id. (quoting Rosa, 168 F.3d at 79-80). District courts have applied Rosa

in remanding appeals in similar cases. For example, in Geronimo, the court held that an ALJ had

erred in affording "little weight" to a treating physician's opinion where the physician's

assessment was "wholly conclusory" and failed to identify supportive tests or other clinical

findings, but where the record suggested that there might be support for his opinion in facts

outside the record. Id.; see also Caldaza, 753 F. Supp. 2d at 269 (finding ALJ committed legal

error in failing to develop the record or seek clarification of the treating physicians' assessments before dismissing them as inadequately supported by clinical findings).

In this case, the ALJ found that Dr. Chen's opinion was insufficiently explained, lacked support in the record, and was inconsistent with other medical records, including some of Dr. Chen's own materials. (See R. at 15, 19; see also Def.'s Reply at 4.) Indeed, as the court sets forth below, Dr. Chen's records reflect several ambiguities with respect to Plaintiff's treatment. Thus, especially where Plaintiff was proceeding pro se, and where Dr. Chen was a significant source of Plaintiff's treatment, the ALJ was obligated to seek clarification and additional information to resolve these issues before dismissing the doctor's opinion. See Rosa, 168 F.3d at 79.

First, the record makes clear that Dr. Chen was Plaintiff's most significant source of treatment. Plaintiff began receiving treatment from Dr. Chen at AFHC in April 2008, after which Plaintiff saw Dr. Chen an additional 7 times through December 2008, and Dr. Chen kept notes from each of these appointments. (See R. at 214-16 (Apr. 29, 2008); 217-18 (May 6, 2008); 219-20 (May 13, 2008); 221-22 (July 31, 2008); 225-26 (Oct. 1, 2008); 227-28 (Dec. 8, 2008); 229-30 (Dec. 29, 2008)).

Second, the record of Dr. Chen's treatment suggests that Plaintiff's conditions steadily worsened. On July 31, October 1, and December 8, 2008, Dr. Chen signed additional documents, separate from his medical notes, in which he indicated that Plaintiff had significant physical limitations that increased in severity over time. Specifically, the July note corroborated a diagnosis of back pain with a herniated disc at L4-L5, and advised that Plaintiff avoid heavy lifting or prolonged sitting. (Id. at 179; repeated at 262.) The October note indicated that Plaintiff was unable to work at the time because she was receiving physical therapy and pain

management. (Id. at 180; repeated at 260.)[7] Finally, the December form reflected that Plaintiff was unable to work for at least 12 months. (Id. at 269.)

Third, this record of Plaintiff's deterioration introduced a notable degree of ambiguity into the overall medical record, the remainder of which, as Defendant argues, suggested that Plaintiff was limited by her condition, but not so limited as to be disabled within the meaning of the Act. (Def.'s Reply at 4.) This inconsistency was only further complicated by Dr. Chen's lack of explanation for his opinions, despite his extensive treatment of Plaintiff. For example, Dr. Chen's conclusion that Plaintiff was unable to work in October 2008 appeared to be based on the fact that she was receiving physical therapy and pain management. In addition, as the ALJ pointed out, Dr. Chen provided no reasoning for his December 2008 assessment that Plaintiff was unable to work for at least 12 months. (R. at 19.)

Not only did Dr. Chen articulate his conclusion without explanation, his other notes from the December 8, 2008, appointment fail to clarify his determination. To begin, most of his notes are so difficult to read they are almost illegible. Although Dr. Chen wrote more clearly that Plaintiff needed to consult a neurologist and receive pain management in addition to receiving an MRI of the c-spine, his notes do not explain why such consults were needed, and for how long Plaintiff needed to undergo pain management. (Id. at 228.) In addition, on the same December form in which Dr. Chen indicated that Plaintiff was unable to work for 12 months, he wrote elsewhere that there had been "little improvement" in her condition, but that Plaintiff's condition had "stabilized." (Id. at 268-69.) It is unclear how Dr. Chen's observation that Plaintiff had seen "little improvement" is consistent with his view that Plaintiff's condition had "stabilized."

---

[7] As the court described above, Dr. Ilan also completed a form in November 2008 in which he indicated that Plaintiff was "temporarily unemployable," and that if Plaintiff did not respond to physical therapy, she should undergo 4 to 6 weeks of pain management. (R. at 265 (emphasis added).)

Fourth, not only were Dr. Chen's opinions accompanied by ambiguities and apparent gaps in reasoning, but here, as in Geronimo, the ALJ was aware that other documents with additional facts regarding Dr. Chen's treatment of Plaintiff after December 2008 remained outstanding. For example, Plaintiff informed the SSA—in her original appeal from the SSA's initial denial of DIB and SSI—that she had received treatment from Dr. Chen at AFHC in March 2009, and was scheduled for an additional appointment on April 9, 2009. (See R. at 148.) And the ALJ himself appeared to be aware that the medical record was incomplete. At Plaintiff's July 7, 2010, hearing, the ALJ indicated that he would seek further information to supplement the record on Plaintiff's behalf,[8] and he specifically discussed wanting to confirm that he possessed all of the necessary medical records. (See R. at 52-53.) However, while the ALJ did attempt to obtain records from Mount Sinai Hospital regarding Plaintiff's medical history (id. at 311-15 (noting no records were found)), the record does not reflect that the ALJ ever sought to obtain any further information from Dr. Chen or his primary facility, AFHC.

This failure to obtain additional records is critical because Plaintiff was proceeding pro se, Dr. Chen was a significant treating source, Dr. Chen's opinion was largely unsupported by the remainder of the record, and the absence of supporting explanation was one of the central reasons given by the ALJ for discounting Dr. Chen's opinions. (See R. at 14-15, 19.) See, e.g., Ulloa v. Colvin, No. 13-CV-4518 (ER), 2015 WL 110079, at *12 (S.D.N.Y. Jan. 7, 2015) (adopted report and recommendation) (remanding where ALJ "did not explore or try to resolve these inconsistencies" in treating physician reports, "considering the importance of opinions from treating physicians in the determination of disability"). As a result, it was incumbent upon the ALJ to follow up with Dr. Chen to seek further explanation of the observations and diagnoses

---

[8] The ALJ did, in fact, supplement the record after the hearing, adding vocational expert Leopold's interrogatory responses (R. at 171-74), and medical expert Dr. Axline's interrogatory responses (id. at 316-36).

underlying Dr. Chen's conclusions as reflected in his treatment records. See Cruz v. Sullivan, 912 F.2d 8, 12 (2d Cir. 1990) (noting the Second Circuit has "repeatedly stated" that "when the ALJ rejects the findings of a treating physician because they were conclusory or not supported by specific clinical findings, he should direct a pro se claimant to obtain a more detailed statement from the treating physician"); see also id. at 9, 12 (ALJ was obligated to further develop the record where treating physician submitted a statement of only a few lines concluding plaintiff was unable to work); Cleveland v. Apfel, 99 F. Supp. 2d at 380 (ALJ was obligated to obtain a more complete report from plaintiff's treating physician where the ALJ "made no attempt to develop the record," and instead "discounted [the treating physician]'s findings and relied on the consulting physician's assessment that plaintiff was able to work).

Defendant argues that the ALJ properly dismissed Dr. Chen's opinion without re-contacting him because his "conclusory statements" were not supported, and the remainder of the evidence was adequate to determine plaintiff's disability status. (Def.'s Reply at 3-4.) Thus, according to Defendant, the issue "is not an absence of evidence, but rather resolving inconsistencies in the evidence," and thus it was proper for the ALJ to reject those portions of Dr. Chen's opinion that were unsupported by the objective evidence of record. (Def.'s Reply at 5.) This argument fails for two reasons. First, as the court has already explained, the ALJ was aware that there might be additional facts outside the record that supported Dr. Chen's opinion. Second, and more importantly, Defendant's apparent view of the process is backward. Defendant suggests that the ALJ was entitled to apply the treating physician rule in determining whether it was even necessary to re-contact Dr. Chen. (See Def.'s Reply at 3.) This is not the proper approach. Instead, because Dr. Chen was a treating physician, the ALJ was first required to follow up with him in order to fully develop the record before determining how much weight

23

to assign to Dr. Chen's opinion. In other words, to find that a treating physician's opinion is not entitled to much weight because it was inconsistent with the record and unsupported—and therefore that it was unnecessary to follow up with that physician to establish whether that opinion could be supported—puts the cart before the horse.[9] See also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")

Consequently, the ALJ's failure to seek further explanation or clarification from Dr. Chen, Plaintiff's primary treating physician, warrants remand. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the Second Circuit has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." (quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980))); see also Ulloa v. Colvin, No. 13-CV-4518 (ER), 2015 WL 110079, at *12-13 (S.D.N.Y. Jan. 7, 2015) (adopted report and recommendation) (remanding appeal as a result of ALJ's unexplained failure to obtain further records from treating physician); Elliott v. Colvin, No. 13-CV-2673 (MKB), 2014 WL 4793452, at *18 (E.D.N.Y. Sept. 24, 2014) ("[W]here the ALJ has failed to fully develop the factual record, the proper remedy is to remand the case for further proceedings."); Antoniou v. Astrue, No. 10-CV-1234 (KAM), 2011 WL 4529657, at *14 (E.D.N.Y. Sept. 27, 2011) ("Because the ALJ found that [the treating physician]'s Medical Source Statement did not indicate the basis for his opinion, but did not re-contact [the treating physician] to ascertain the basis for his opinion, remand is required.").

---

[9] Plaintiff suggests that the ALJ's failure to develop the record amounts to a violation of the treating physician rule. (See Pl.'s Mem. at 12-13.) In light of this court's finding that remand is warranted in order for the SSA to follow up with Dr. Chen, the court need not—and does not—address this claim.

The SSA ultimately may be unable to procure additional evidence or explanation from Dr. Chen, and the court takes no view as to the proper weight to be assigned Dr. Chen's opinion in those circumstances.[10] But that possibility does not affect this court's decision to remand the case in light of the ALJ's failure to follow up with Plaintiff's treating physician in the first instance. See, e.g., Geronimo, 2015 WL 736150, at *7 ("[The ALJ's] decision and the Commissioner's motion both presume that [the treating physician]'s failure to identify supportive findings is due to his sole reliance on Plaintiff's subjective complaints as the foundation for his opinion. While that might ultimately be true, drawing such an inference would undercut the very principles underlying an ALJ's duties to develop the record and to pay deference to the opinions of treating physicians.").

## V. CONCLUSION

For the reasons set forth above, the ALJ's failure to develop the record provided by one of Plaintiff's treating physicians constitutes legal error. Therefore, the Commissioner's motion for judgment on the pleadings is DENIED, Plaintiff's cross-motion for judgment on the pleadings is GRANTED. This case is REMANDED to the SSA for further proceedings in accordance with this Memorandum and Order.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
August 13, 2015

NICHOLAS G. GARAUFIS
United States District Judge

---

[10] Plaintiff also suggests that the ALJ could have sent Dr. Chen a form similar to the one he asked Dr. Axline to complete regarding Plaintiff's RFC. (See Pl.'s Mem. at 12.) Because Plaintiff does not argue that the ALJ was required to do so, the court need not—and does not—reach this question.